Thank you, Your Honor. Frannie Forsman, appearing on behalf of Mr. Gene Moran. Throughout this litigation and throughout this appeal, we have challenged the government to point to anywhere in the record where a witness was asked, is the methodology used by Ed Halal, self-described sewer cop, in collecting samples in this case, did anyone ask the question, are the methods that he used reliable, valid, anything that would comply with Rule 702? The government has been unable to do that, and that is the reason that you don't have any findings by the court on the methods that were used in collecting the samples reliable. The court did not answer that question because it couldn't, because there is nothing in this record. Here's what happened. The first day of testimony, Mr. Halal got on the stand, and the first thing that the judge was concerned, and he said, were you following some protocol? This is found at EOR 421. Were you following some protocol, some step-by-step procedure? And Mr. Halal said, well, I was looking for metals. He couldn't answer the court's question. We recessed for the day. He came back. He came back with two pages from a manual and his workbook from Cal State University. And he didn't even reference anything in either of those documents that would permit anybody to find that what he was doing, and the reason that I brought Exhibit 80 was so that you could see what he was talking about. You have a smaller version in the evidence vault at the court. And what this is, and the reason this is important, is because the government was using these samples to show that, and argued so, that during a specific period of time, there were discharges from Silver State plating, and that therefore, the jury could conclude that Mr. Moran knew that those discharges were occurring because at that point in time, Mr. Gold was no longer in the facility. They specifically, not only did they charge it that way on specific dates because they had to, but they also argued that that's what this testimony showed. So they needed to show that those, that the results of the lab were applicable to those particular time periods, those particular dates on the counts. Now, you were permitted to cross-examine Mr. Yamashita. Is that correct? Yes. All right. Why, then, didn't you have an opportunity to point out any deficiencies in the sampling? The problem is, is that that's not how the analysis starts. It must start with whether or not the protocol that was used was reliable, because there's nothing to compare it to. Well, can I ask a question about that? We've had a lot of difficulties with DALBERT, to put it mildly. And what you are saying is that the way that the samples were taken have to be demonstrated to have been scientifically acceptable practices, I guess. At least the method needs to be. The method. All right. And I would have thought that it wasn't the sampling, but it was the way that it was tested. That would be the science here. And I'm just wondering, you know, how we write this. If a chemist or a scientist comes in and says, I tested the blood for certain diseases that are new, it's a new kind of test. You would go to the kind, you would apply DALBERT to the test. I've never heard of anybody saying, but how did you get the blood? And you have to validate that. Now, why would we be validating the sampling rather than the actual testing of the sample here? Well, that came up in the Shishchili case. There was actually a question with regard to the sampling technique in Shishchili. And here's what this Court said, is that an alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself. So what you'd learn from that is that you have to start with a reliable methodology for sampling. Even the government's exhibits say repeatedly that the laboratory and the sampler have to work in conjunction, that the sampling results are only as good as the technique which is established by the laboratory and the sampler together. In this case, we know that anybody. He never asked anybody what method he should use. He told the Court that he had never done this kind of sampling before. His supervisors said they had no procedures in place for the sampling. And basically what happened, Your Honors, is that throughout this proceeding, what we did was, all they did was eliminate protocols that could have been applied. The government is very critical that we were using, for instance, EPA protocol 1669, which was the only one we could find. Then Mr. Hillall testified that there was no regular procedure for doing this. And then he described to the district court the procedure that he used. The district court was satisfied and said proceed, and then permitted counsel below to cross-examine Mr. Yamashito, Mr. Gold, and so forth. The district court judge did make a determination, did he not, that this, from what he heard from Mr. Hillall, that this, he did the best under the circumstances. And he actually changed his methodology as he went along, but to make it more accurate. Why, then, was that Because the court never made a determination of reliability. What the court did was to place the burden on the defendant, and you can see it right from his ruling, is the court never said, I find that the methodology that was employed is reliable, but instead went straight to, this is not an admissibility question at all, did no analysis. You couldn't do what the court did in Chischilly. You could not go through this record and do the same examination of the methodology that happened in Chischilly, because it's not there. The government is the proponent of the evidence. Never put in any of the evidence which would allow you to do that. And then instead what the court did is it said the test was whether or not the findings were consistently the product of the less than rigorous sampling protocols. That's placing the burden on me. And the problem is, Your Honors, is that if this goes to the jury, what I cross-examine in front of the jury, what are they comparing it against? As opposed to Chischilly, where they came in and they said, here's the methodology for DNA testing, here's the methodology for DNA sampling, the jury then could, and this is scientifically reliable and we've been using it for years, the jury can then say, well, here are the defects that were pointed out in cross-examination, compare that and make a factual finding. Let me ask just one more question. Didn't the district court determine that there was no standard methodology? Therefore, he tried to determine whether the methodology used in this case was reasonable, and he determined that it was. If there is no methodology with which to compare it, then how can you follow you know, how can you say that he had to compare it to something that didn't exist? Because with scientific testimony and under Rule 702, the testimony must be the product of reliable principles and methods, not he did the best he could. That's sort of like saying that's good enough for government work. He felt it was reliable, as I read the record, as reliable as it could get under the circumstances, but I understand your position. He did. I take it there's nothing in the record that suggests a more reliable method of sampling, or is there? Well, they had witnesses on the stand. They had Stuart Simpson, who is the, works with the National Enforcement Investigation Center for the EPA, and says, Mr. Simpson says, for instance, that I always use a sampling plan because you must adjust your sampling techniques to the circumstance. If they could have gotten a witness, which is what they needed to do to say that what Mr. Hallow was doing was reliable, scientific, and could be, could complete the factors, it could fulfill the factors under 702, they needed to do that. Because let me tell you the danger of this testimony. This man will be going to prison based upon this testimony, and what happened was, is he took construction sand, put it in an inner tube, stuck it down in this hole, jammed the sampler down, knocked down some steps, took a couple attempts at it, and then what happened was, is you had, they did nothing to determine whether or not there was substance in that pipe, did nothing to determine whether or not substances that could have been discharged under a prior ownership, or when John Gold was there, which the jury found Mr. Moran knew nothing about when Mr. Gold was there, because of their verdict. They built this weir, which is this elliptical, elliptical thing here. This is the sampler. He stuck it on the bottom of the pipe, according to his testimony, and anything that caught, it was not the regular flow, because the weir made the water go up. So we don't know, because of their failure to be able to even talk with Mr. Hallow before he did it, to see whether or not what he was doing was scientifically valid, or the methodology was such that it could create, it could pick up reliable samples, because they failed to do that. There is a real danger in this case, that what those samples from the laboratory showed were metals that were on the sides of the pipes. Now, all they needed to do was to call a witness and say, this is acceptable, this is scientifically reliable, this is what we do at the EPA Enforcement Institute. They couldn't do that. The reason they couldn't do that is because Mr. Hallow and the Clark County Sanitation District never talked to anybody, including the laboratory, before they employed a set of methods that they'd never used before, that has no scientific validity anywhere. And I suggest to you, again, that the Chishchilly case, if you tried to go through the analysis that this court did in Chishchilly, you couldn't do it on this record. You couldn't look at whether or not there were standards in place. And they did talk about sampling. They did talk about the methodology used, both in the lab and in picking up the samples. And that's the case that the government relies on. You can't do the analysis. Because they were trying to go backwards, after it was clear that Mr. Hallow was applying no standards whatsoever, they were trying to go backwards, and they couldn't even get their own people to validate what he did. In a case in which the jury found my client not guilty of every single charged count in this indictment, and we are now down to the lesser-included, negligent charges, based primarily, admittedly, on the laboratory evidence, they aren't even making an argument that this was non-prejudicial. They couldn't, because they know that this scientific testimony is what is going to send my client to jail if this case is not reversed. And all I'm suggesting to you is that you will not find a finding of reliability by this judge. He did not make that finding. He never made that finding. Can you help me a little bit with just the diagram? Describe it again to me, how this works. Okay. This is the manhole up here. Now, it's a manhole leading down into, I mean, how are we getting a manhole in a river? I mean, is this a... No, it's not a river. Oh, so it's an underground sewer pipe. It's a sewer manhole. Okay, okay. And it's downstream from Silver State Planning, and so this is the manhole at the top. Yep. This, that I'm tracing here that looks like sort of a rounded top rectangle, is the sampler. This is the bottle that he talks about that collects the sample, and this is a hose that goes down to a collector that sits on the bottom of the sewer pipe. Okay. This is the tire tied off with twine that's filled with construction sand. Okay. And understand, Mr. Glau talked about taking this thing out several times, about taking the tire thing out several times during the course of the sampling. He also talked about this is the level of the flow, about he put the sampler down. He couldn't get a sample initially because the flow was too low, so he changed the normal flow of the effluent in the sewer pipe so that it rose inside the pipe. That was not what the normal flow was. He testified to that. He had to make it higher in order to pick up the sample. Okay. I would suggest, if you have a- So the water comes up. It then goes into, I'm not sure what to call it, that- Back up. The water's going- Yeah, so the water's backing up because of the tire with the construction sand in it. Right. It then goes into what looks like a little box, and then it's forced up through a pipe- This thing takes samples for a given period that it's set for. It's sucked up through the pipe into- What's doing the sucking? A peristaltic pump inside the sample. So you've got a little pump that's pumping it up. But whatever's going into that little box that's being picked up in the sewer is also going into that box and is ending up in the sample. Right. And your argument is there's been insufficient showing that what we're getting is a sort of a pure flow of what's newly coming in. You're saying there may be stuff on the bottom of that pipe left over from prior discharges, who knows what. Who knows what. That's the argument. And that if they are going to try to use the laboratory results based upon those samples, then it is incumbent upon the proponent of that evidence to show that the method for collecting those samples was reliable. I just came back from a committee meeting on jury issues, and I was thinking during the jury litigation that if we actually had an expert come in and challenge the representatives of a jury sample, I was trying to think of analogies to sampling, the reliability of a jury sample, and what happened was this expert comes into court and says, well, I've never done this before. It isn't a regular practice of ours. I didn't talk to anybody, but I just sort of looked around and took some numbers, which is what happened here. They were not even able to show that he followed the procedures for that pump, because when Simpson got up there, he said, well, that really doesn't apply, because those are only recommendations. Those aren't requirements. So basically what the government did was everything that we said, well, is this the protocol? Is this the protocol? The government came to the Senate and said, well, no, you don't have to comply with this. No, you don't have to comply with that, and never offered up a protocol that Mr. Hillel should have complied with. I guess I read, I mean, I hear the arguments that you're making, and they're very forceful, but the question is whether or not this is really a question of legal inadequacy or whether it's a question that really is supposed to go to the fact-finder and to be considered there. And as I read Chisholm, and we'll give you a few minutes in rebuttal and we'll want to hear from the government, but as I read the key portion of Chisholm, it seems to say that the sampling processes, the question of whether or not they were adequate or not, go to the weight to be given to them and not to the admissibility in the first instance. Do you read that language differently regarding the second and third objections regarding potential faults in the DNA sample extraction processes from the labs go to the weight to be accorded the evidence, not to its admissibility? The holding of the court is that if any error in the application of the methodology of sampling goes to the weight, as long as the methodology is reliable to begin with, and I find that on page 1154, an alleged error in the application of a reliable methodology should provide the basis for exclusion. And the problem here is that we don't have that. So your argument really is essentially that there's enough of a possibility that because of the method of gathering, there's a risk that we should be concerned about that this was a contaminated sample, contaminated for something other than the discharge purporting to be measured. Okay. Thank you. And I'd like to reserve the three minutes for rebuttal. Thank you. Good morning. May it please the Court. Matthew Sanders for the United States. In this appeal, the defendant has not raised any grounds for overturning his conviction or sentence. My opposing counsel has emphasized the Daubert issue, which I'd like to focus on, about which the defendant has made two arguments. One is procedural and one is substantive. As a preliminary matter, the defendant raises the procedural argument concerning Daubert for the first time in his reply brief, and for that reason he has waived it. However, even if this Court chooses to address this issue, the defendant's argument is incorrect. Daubert requires a district court in its gatekeeping function to determine whether expert testimony meets a threshold level of relevance and reliability. District courts are afforded wide discretion in how they do this. As the Supreme Court held in Kumho-Tyre v. Carmichael at page 152, the law grants a district court the same broad latitude when it determines how to, excuse me, when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. Well, the real question is when does the district court judge determine reliability? Before it's admitted here, in the district court judge's opinion, he cited to the witnesses who had testified, but as opposing counsel mentioned, those witnesses came in after he made the decision to allow the testimony in. At what point does the district court judge make that judgment? Well, Daubert requires the district court judge to make a preliminary assessment of whether expert testimony is sufficiently relevant and reliable. And here what he did is he allowed Halal and Yoshimoto to testify, and then he held at the defendant's request a Daubert hearing in which he heard the testimony of three additional witnesses, two for the government and one for the defendant. This procedure was not objected to by the defendant. And once he held the Daubert hearing, the district court then determined that Halal's sampling and ultimately Yoshimoto's testimony was sufficiently relevant and reliable to submit to the jury. So he did have the benefit of the testimony of the witnesses before he made the Daubert ruling. That's correct. I mean, here the district court found the issue of sampling protocols to be significant. That is, he didn't try to duck the issue. He wanted a very complete record on the issue. And what he did is he said, let's hear the testimony of Halal and Yoshimoto. And, in fact, he asked the government whether Yoshimoto would be testifying to whether Halal's sampling was, in fact, reliable. He then heard Yoshimoto's testimony, and saying that the issue of sampling protocols was significant, he then held a separate Daubert hearing at the defendant's request and allowed two additional witnesses for the government to testify and heard also from the defendant's witness, Douglas Sims, whom the defendant did not later present to the jury. So here the record at the end of the Daubert hearing, the district court said the record is pellucid on the subject of what was done, and he ultimately determined that, in fact, Halal's sampling was reliable. Today opposing counsel has suggested that the district court never made a determination as to the reliability of Halal's sampling. This is absolutely incorrect. By ultimately concluding that Yoshimoto's testimony was reliable because, or excuse me, should be submitted to the jury, he was necessarily making a determination as to the reliability of Halal's sampling. So the procedural argument that the defendant is making here is that the district court didn't follow the proper procedures under Daubert for determining whether the sampling was reliable. But, again, as Kumho Tyer states, a district court enjoys broad discretion in how it determines reliability under Daubert. This court has repeatedly rejected efforts to limit what form a Daubert inquiry may take. Last week in a Rule 28J letter, we submitted two cases, United States v. Alatorre and United States v. Hanke, both from 2000, Ninth Circuit cases from 2000. Alatorre discussed in broad terms the flexibility of the Daubert inquiry, and Hanke explained that a Daubert inquiry is fact-specific and must be tailored to each specific case. Here the point that I'd like to make is that the district court did its job. It recognized the applicability of Daubert and found the issue of sampling protocols to be significant. It gathered extensive information on what Halal did and did not do at trial testimony and at a separate Daubert hearing, and ultimately ruled that Halal sampling was sufficiently relevant and reliable to present the information concerning the samples to the jury. Daubert requires nothing more. The other argument that the defendant makes concerning the reliability of Halal sampling is a substantive one. He, in fact, argues that Halal's sampling was unreliable. This is what Exhibit 80 and other arguments go to. But the district court found, and the record shows that, in fact, Halal followed a consistent logical series of steps for collecting the samples in this case. We discuss those steps at pages 11 and 26 of our brief. Well, the steps are pretty logical if what you need is enough flow so you can collect the water, but there seems to be at least some possibility of danger that if you're backing the water up that you will pick things up off the bottom that have been sitting there that are not coming with the new flow. Well, Your Honor, that's certainly true, and this was an issue that was testified to extensively at trial. But the point is – In front of the jury or just in the Daubert hearing outside the presence of the jury? Well, Halal testified about the steps that he followed, including constructing a weir to raise the level of water in the sewer, and then Halal was cross-examined concerning whether things might have been introduced into the sampler. Before the jury? Before the jury, yes. Yoshimoto also testified about this, and then it was also testified to during the Daubert hearing. But as was explained fully at trial and during the Daubert hearing by Stuart Simpson, who is regional technical coordinator for the EPA's National Enforcement Investigation Center, none of the potential sources of contamination to which the defendant has pointed could have introduced significant contamination into the samples. I would direct the Court to page 13 of our brief, in which we present a chart showing the violations in this case. These violations are not borderline violations. They are significant violations that would not be impacted by trace contamination or other minor missteps. I mean, there are violations involving metal concentrations that exceed federal limits by anywhere from 112 percent to near 200,000 percent. The potential sources of contamination to which the defendant has pointed, such as the rubber weir that was used to raise the level of water in the sewer, or the pounding down on the plastic manhole steps, could not have introduced any significant contamination into the samples. They would have introduced, if anything, contamination in the parts per billion range. The concentrations of metals listed at page 13 of our brief and the concentrations of metals that were found in the samples were in the parts per million range. That is 1,000 times higher than the sources of contamination to which the defendant has pointed in this case. This was an issue that was testified to extensively at trial. Let me ask you about the testimony of Mr. Gold, his co-defendant. If that testimony had been excluded, was there still sufficient evidence to convict Mr. Moran? Absolutely. Mr. Moran, the defendant, was convicted on Counts 16 through 20, which were the negligent misdemeanors for violations for specific, for the samples collected during specific periods of time in December 1997 and January 1998. Gold's testimony was not the basis for the defendant's conviction in this case. In fact, Gold wasn't even working at Silver State Plating in December 1997 when Halal began collecting the samples. This is an issue that the defendant has not raised today at argument so far, but he did raise it in his brief. And as we exhaustively briefed in our brief, the defendant's conviction wasn't in any way based upon Gold's testimony. It was irrelevant to the defendant's conviction here. All right. Thank you. Let me ask you this. I heard from opposing counsel as to the convictions that were entered, the testimony with respect to the sample was critical. That is to say, if it was erroneously admitted, it was prejudicial. Do you agree with that? I absolutely agree that if it was erroneously admitted, it was prejudicial because the defendant's conviction was based upon the samples that were collected. So if the testimony with respect to the sample was improperly admitted, that's it? That's correct. But I would remind the court that our position obviously is that the testimony wasn't erroneously admitted. I understand that. The district court did not abuse its discretion in admitting the testimony here because the defendant has not pointed to any source of contamination that would have affected the samples. Moreover, the defendant today at oral argument suggests that, in fact, Halal did not base the procedures that he followed upon any source. This is absolutely incorrect. As we discussed at page 25 of our brief, Halal relied upon years of experience taking samples, training classes, manuals, and a sampler he had used hundreds of times to collect the samples in this case. Government witness Simpson, the defendant suggested today that the government presented no witness who testified that, in fact, the Halal samples were reliable. I would direct the court's attention to excerpts of a record, page 571, in which government witness Simpson, again, who was regional technical coordinator for the EPA's National Enforcement Investigation Center, said, yes, I think the samples collected from that manhole were representative of what was in the sewer during those times that he, Halal, was sampling. When asked the question, and any potential cross-contamination that might have occurred, do you think that would be of a significant, a concentration significant enough to affect the result? He said, no, I don't think so. That is, government witness Simpson testified precisely that, in fact, he thought the methods and procedures followed by Halal in this case were sufficiently reliable in this case to submit the testimony of Yoshimoto concerning the contents of the samples to the jury. And the defendant has not pointed to any evidence that suggests that that is, in fact, not true. How do you distinguish the, or what is your interpretation of a Shishchili case? Shishchili. At page 34 of our brief, pages 33 and 34 of our brief, we cite Shishchili for what we think is the relevant portion, and that is mere disagreement over rather than absence of controlling standards goes to the weight to be given scientific testimony, not its admissibility. Here, the defendant has not demonstrated that there was an absence of controlling standards. In fact, there was extensive testimony, again at trial and during the Daubert hearing, about the procedures that Halal followed here. There's not an absence of protocols. The defendant suggested in his reply brief that the government cannot point, that a party cannot point to a mere collection, a series of steps, and call that a methodology. But there's no requirement in Daubert or any other case that, in fact, a methodology must be standardized or have a formal name. A methodology is, in fact, a collection or a series of steps. I would also, on that point, point, for example, to Yoshimoto's testimony, who, on redirect examination, when he was asked to describe the protocol that he followed, he described it as a series of steps. The same was true of the defendant's witness, Douglas Sims, who described the protocols that he would have followed, that he says Halal should have followed but did not, again as a series of steps. The defendant suggests today that method 1669 was, EPA method 1669, was the only method they could find anywhere against which to compare Halal's procedures in this case. But method 1669, as we discussed at pages 27 through 32 of our brief, is simply not applicable to this case because it goes to testing for trace metals in ambient drinking water. Here, Halal was testing for significant, that is, gross violations of federal limits for metal discharges in wastewater. That simply wasn't applicable. And so what the district court heard here and what the jury heard was extensive testimony on what procedures Halal followed and those that he did not follow. And the district court, again, I would emphasize, made a reasonable conclusion, did not abuse its discretion after conducting an extensive Daubert hearing about whether, in fact, Halal's sampling and ultimately Yoshimoto's testimony could be submitted to the jury. I would like to briefly address the sentencing issue, which the defendant did not raise today at argument so far. The defendant makes an attack both on the guidelines and an attack on the sentence itself. First, he argues that the guidelines must explicitly distinguish between negligent and knowing conduct. But this is, in fact, what the guidelines do. The guidelines provide for an optional downward departure for negligence at Section 2Q1.2. There's also the catch-all provision at Section 5K2.0, which allows the district court to consider factors it feels are inadequately accounted for in the guidelines, including mens rea. These provisions reflect congressional intent, which is to provide a process whereby district courts can consider differences in mental state during sentencing. As for the attack, the defendant's attack on his sentence itself, a district court's decision to sentence similarly two defendants with different mental states is not by itself grounds for review. As the Fifth Circuit put it in the United States v. Boyd, a defendant may not use his co-defendant's sentence as a yardstick for his own. And second, as we discussed in our brief, the district court could properly consider acquitted conduct during sentencing. As for the remaining issues concerning Gold's testimony in the public welfare doctrine, I think we can rest on our brace. Thank you very much. Thank you. Ms. Forsman. Your Honor, we agree with the government that the issue in Chisholm, which was decided, was whether or not there was an absence of controlling standards. And I think that the record is clear in this case that there were no controlling standards. They essentially conceded that. If you look at EOR 571 for the basis for the standards, there is not a question of Mr. Simpson as to whether or not the method that was used by Mr. Simpson. Standards for what? Standards for the collection of the samples, or the methodology for the collection of the sample. Mr. Simpson actually says that that's not what he does when he's doing enforcement sampling. He doesn't do it the way Mr. Halal does. And he has never asked the question of reliability, and the Court never rules on the question of reliability. I'm not sure why counsel is suggesting that we raise some issue for the first time in the opening brief. Excuse me. Page 26 and 27, that's exactly the issue we raised with regard to the burden of proof, and the Court did not require the government to prove that Halal's methods and standards were reliable. That's precisely the issue that's in the reply brief. That's precisely the issue that I'm arguing. That's precisely the issue that's raised in the opening brief. So I'm not sure where that comes from. The Chischilly case, again, I would ask that the Court, if you – they rely on Martinez, which is very clear that it is a two-step process, that there first must be a preliminary determination of reliability of the methodology, and then you proceed to the second question. I think the Court should consider what it is like when we are searching in order to be able to challenge these methods, when there is simply no scientific basis for what Mr. Halal did. They easily could have simply gone to the lab and said, what procedure should I use? What the government is arguing here and what is very dangerous, and if this holding were to be true, you could get any testimony in, including the testimony that was excluded in Daubert. All the expert would have to do is to say, I have a step-by-step procedure, and these are the steps that I followed. That's what the government's argument is, and that's what the Court held. As long as you have a procedure, regardless of whether or not it's reliable, you can go forward with scientific testimony. That's not what Rule 702 requires. That's not what Daubert requires. That's not even what Frey required. If we were to agree with you that the district judge put the burden of proof on your client rather than on the government as to the reliability of the sampling methodology, would it be sufficient for us to remand to allow the district judge to decide the question using the proper burden of proof? I would rather that you reverse, of course. But you didn't ask me that question. If the Court were to review this record, I think if the Court actually applied the appropriate burden, I think that we would have to prevail. So I think we would have to prevail because there simply was no testimony in this record. You would have to prevail, meaning we should remand for that determination, or we can do that right now? I think what you should do is what happened in Chisholm. I don't think you should remand. I think you should look at the record that the government made in an appropriate proceeding, and this is not a plain error review. They had the time to do it, and they didn't do it. They couldn't do it. Okay. Thank you. I think we understand your position. The case just argued is submitted for decision. The Court appreciates the quality of the arguments on both sides. Thank you.
judges: Schroeder, Dw Nelson, W. Fletcher